UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on May 5, 2015

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO.   1:12-cr-00248 (CKK) |
| v. | : | |
| | : | VIOLATIONS: |
| ALEX ALMASI, and | : | 18 U.S.C. § 1349 (Conspiracy to Commit |
| ATTILA KARTALY, and | : | Bank Fraud and Mail Fraud); |
| ATTILA MOLNAR,  and | : | 18 U.S.C. §§ 1344(2) (Bank Fraud); |
| GABOR PATAKI, and | : | 18 U.S.C. § 371 (Conspiracy to Commit |
| LASZLO HESZ, and | : | Travel Act Violation and Use of a False |
| ZOLTAN KOSZEGI, and | : | Passport; |
| FERENC GAJDOS, AKA: | : | 18 U.S.C. § 1956(h) (Conspiracy to |
| D.B., and | : | Commit Money Laundering) |
| ALFRED KUTTENBERG, AKA: | : | 18 U.S.C. § 2 (Aiding and Abetting) |
| M.D., | : | FORFEITURE ALLEGATION: |
| T.S., | : | 18 U.S.C. § 981(a)(1)(C); and |
| P.V., and | : | 18 U.S.C. § 982(a)(1), (a)(2); |
| P.K., | : | 28 U.S.C. § 2461(c) (Criminal Forfeiture) |
| | : | |
| Defendants. | : | <u>UNDER SEAL</u> |

<u>SUPERSEDING INDICTMENT</u>

The Grand Jury charges that:

At all times material to this Superseding Indictment:

<u>Introduction</u>

1.      Defendant ALEX ALMASI ("ALMASI") was a resident of Budapest, Hungary.

2.      Defendant ATTILA KARTALY ("KARTALY") was a resident of Hungary.

3.      Defendant ATTILA MOLNAR ("MOLNAR") was a resident of Hungary.

4.      Defendant GABOR PATAKI ("PATAKI") was a resident of Hungary.

5.      Defendant LASZLO HESZ ("HESZ") was a resident of Hungary.

6.      Defendant ZOLTAN KOSZEGI ("KOSZEGI") was a resident of Hungary.

7.      Defendant FERENC GAJDOS, also known as ("AKA"):   D.B. ("GAJDOS") was a resident of Hungary.

8.      Defendant ALFRED KUTTENBERG, AKA: M.D., T.S., P.V., and P.K. ("KUTTENBERG") was a resident of Hungary.

9.      Co-Conspirator 1 ("CC-1"), Co-Conspirator 7 ("CC-7"), Co-Conspirator 8 ("CC-8"), Co-Conspirator 9 ("CC-9"), Co-Conspirator 11 ("CC-11"), Co-Conspirator 20 ("CC-20"), Co-Conspirator 21 ("CC-21"), Co-Conspirator 22 ("CC-22"), Co-Conspirator 23 ("CC-23") were residents of Hungary.

10.     Co-Conspirator 12 ("CC-12") was a resident of the United States.

11.     Co-Conspirator 14 ("CC-14") was a resident of Israel.

12.     Co-Conspirator 10 ("CC-10") was a resident of Romania.

13.     Bank of America, N.A. ("Bank of America"), Capital One Bank, N.A. ("Capital One Bank"), Citizens Bank, N.A. ("Citizens Bank"), JP Morgan Chase Bank, N.A. ("Chase Bank"), PNC Bank, N.A. ("PNC Bank"), Sovereign Bank, N.A. ("Sovereign Bank"), SunTrust Bank, N.A. ("SunTrust Bank"), TD Bank, N.A. ("TD Bank"), Wachovia Bank, N.A. ("Wachovia Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo Bank"), were all federally-insured with the Federal Deposit Insurance Corporation and were financial institutions as defined in Title 18, United States Code, Section 20, with branches in the District of Columbia and elsewhere.

## The Vehicle Fraud Scheme

14.     From in and around November 2010 through in and around April 2013, within the District of Columbia and elsewhere, defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, KOSZEGI, GAJDOS, and KUTTENBERG, and others, known and unknown to the grand

jury (collectively referred to as the "co-conspirators"), organized and participated in a scheme targeting victims by way of fraudulent advertisements on the Internet for the purported sale of vehicles.

15.    It was a part of the scheme that co-conspirators posted and arranged to post fraudulent advertisements for cars, motorcycles, boats, and other high-value items for sale ("vehicles") on such Internet marketplace and auction websites as www.ebay.com and www.cars.com.    These advertisements often contained photographs and detailed descriptions of the advertised items.    Unbeknownst to the buyers, the co-conspirators, who purported to, but did not in fact, own the vehicles, were merely advertising the vehicles to lure buyers into transferring funds to the co-conspirators.

16.    In response to these fraudulent advertisements, interested buyers contacted the purported "sellers" of the vehicles, and the parties generally communicated and negotiated primarily via email.    The purported "sellers," often based in Romania, or elsewhere outside the United States, adopted false names for these communications.    When the parties reached an agreement, the "sellers" often sent sales agreements and invoices to the victim buyers.

17.    The purported "sellers" sent invoices, claiming to be from such online payment services as Amazon Payments, by email to the victims, instructing the victims where to transfer their payments.    These invoices, however, were fraudulent.

18.    The fraudulent invoices included wire transfer information, such as the names and addresses of the designated wire transfer recipients in the United States, as well as the recipients' bank account numbers and routing numbers.    These recipients were co-conspirators, known as "arrows" and "money mules," who traveled to the United States from Hungary and elsewhere to open bank accounts to receive the proceeds of the scheme.

3

19.    In order to open bank accounts for the purposes of furthering the vehicle fraud scheme, the "arrows" used false passports and other fake identification documents procured by co-conspirators.  These fraudulent identification documents ("identity sets") included genuine photographs of the "arrows," but false names and other identifying information.

20.    As part of the scheme, co-conspirators required that the bank accounts opened by the "arrows" include on-line access.

21.    The co-conspirators induced at least one hundred seventy (170) victims, located primarily in the United States, collectively to transfer at least $4,000,000 to bank accounts controlled by members of the conspiracy, and the co-conspirators were able to withdraw approximately $3,236,507 from the fraudulently opened accounts in the United States.

22.    After withdrawing proceeds of the vehicle fraud scheme from the fraudulently opened bank accounts, the "arrows" generally kept a percentage of the proceeds for themselves and delivered the rest to other co-conspirators, who then transferred the funds to yet other co-conspirators located in Europe using techniques such as bulk cash smuggling, transfer to foreign bank accounts, and delivery to unlicensed money transmitters, also known as "hawalas."

## COUNT ONE
### (Conspiracy to Commit Bank Fraud and Mail Fraud)

### The Conspiracy

23.    The allegations set forth in paragraphs 1 and 22 of this Superseding Indictment are realleged and incorporated by reference herein.

24.    From in and around November 2010 through in and around April 2013, within the District of Columbia and elsewhere, defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, KOSZEGI, GAJDOS, and KUTTENBERG, and other co-conspirators, known and

4

unknown to the grand jury, did knowingly and willfully conspire, combine, confederate, and agree to commit offenses against the United States, to wit:

a.      knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344(2) (bank fraud); and

b.      knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud, willfully caused to be deposited mail matter to be delivered by United States Postal Service and private and commercial interstate carriers, in violation of Title 18, United States Code, Section 1341 (mail fraud).

## The Goal of the Conspiracy

25.      The goal of the conspiracy was for the co-conspirators to enrich themselves through their execution of a scheme using the Internet to offer and to sell to interested buyers vehicles that the co-conspirators purported to, but did not in fact, own.

## The Manner and Means of the Conspiracy

26.      Among the manners and means by which the co-conspirators would and did carry out the objectives of the vehicle fraud scheme conspiracy were the following:

a.      They falsely offered for sale vehicles that they did not own, on Internet websites such as www.ebay.com and www.cars.com to buyers located mainly in the United States.

b.      They created fraudulent advertisements on the Internet for the vehicles to attract the attention of potential buyers.   The prices offered for the vehicles were lower than those offered by legitimate sellers to garner interest from the buyers and to induce them to contact the purported sellers.

c.      They communicated with potential buyers via email and telephone to negotiate the sale of the vehicles and to induce unsuspecting buyers of the vehicles to deposit moneys into fraudulently created bank accounts via wire transfers.   After the buyers delivered the moneys into the accounts, co-conspirators ceased communications with the buyers and did not deliver the vehicles.

d.      They recruited "arrows" and "money mules" to travel to the United States, including the District of Columbia, to open fraudulent bank accounts to execute the scheme.

e.      They provided the "money mules" with travel documents, dictionaries, maps, contact information, computers, cell phones, and cash to execute the scheme, and they directed the "money mules" to various cities, hotels, banks, and other locations in the United States to execute the scheme.

f.      They controlled and directed the "money mules" in person in the United States and from Europe via electronic signals, including, draft email, telephone calls, and computer-based chat applications, while the "money mules" were in the District of Columbia and elsewhere.

g.      They obtained false identity sets that were provided to the "money mules."

h.      The "money mules" opened mailboxes at United Parcel Service ("UPS") stores in the United States to establish mailing addresses for purposes of opening fraudulent bank accounts.   The "money mules" also used the mailboxes to receive false identity sets that were sent

6

from Europe to the United States via the United States Postal Service and private and commercial interstate carriers.

i.    They established limited liability companies ("LLCs"), which they named to correspond with the transportation industry and trustworthy businesses to give them an appearance of legitimacy to lull the buyers of the vehicles into a false sense of security.

j.    The "money mules" opened over 70 personal and business bank accounts at various financial institutions in the United States, including the District of Columbia, using false identity sets.

k.    They induced the unsuspecting buyers of the vehicles, through the false advertisements and subsequent communications, to wire transfer money into bank accounts that the "money mules" had fraudulently opened in the United States.

l.    The "money mules" withdrew the money, usually in cash, from the fraudulently opened bank accounts after the unsuspecting buyers wired payments for the vehicles to the accounts, via electronic means from Automated Teller Machines ("ATMs"), and in-person, using false identity sets.

m.    The "money mules," while in the District of Columbia and elsewhere, provided the proceeds from the scheme to other known co-conspirators, including CC-1, CC-7, CC-12, and CC-23, for delivery to co-conspirators in Europe using one of three methods: bulk cash smuggling; using an unlicensed money transmitter, known as a hawala; and wire transfers to accounts located in Hong Kong, and elsewhere in the People's Republic of China.

## Overt Acts

27.    In furtherance of the scheme and artifice to defraud and to affect the objects thereof, the co-conspirators committed the following overt acts, among others, in the District of Columbia and elsewhere:

a.    In or around fall 2010, CC-10 met with defendants ALMASI and KARTALY, and CC-7, among others, in or around Budapest, Hungary, to explain the vehicle fraud scheme, and to invite them to join the scheme by providing "money mules" to travel to the United States to open bank accounts there to allow individuals interested in purchasing vehicles to wire transfer proceeds into the accounts.

b.    From in or around November 2010 through in or around April 2013, defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, and KOSZEGI, together with other known co-conspirators, recruited and provided "money mules" to participate in the scheme.

c.    From in or around November 2010 through in or around April 2013, defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, and KOSZEGI, together with other known co-conspirators, sent "money mules" to travel from Europe to the District of Columbia and elsewhere to perpetrate the scheme.

d.    From in or around November 2010 through in or around December 2010, defendant ALMASI provided financing for expenses related to the execution of the scheme, including funding CC-1's and CC-7's travel to the United States for the purpose of opening bank accounts.

e.    From in or around November 2010 through in or around April 2013, from places outside the United States, CC-10 worked with other co-conspirators, known and unknown to the grand jury, who organized the fraudulent on-line postings and caused the wiring of the

8

victim funds from the scheme to the bank accounts opened by the co-conspirators in the United States.

f.      From in or around November 2010 through in or around December 2011, defendants KARTALY, PATAKI, HESZ, and KOSZEGI, together with other known co-conspirators, traveled to the United States to meet with the "money mules" and to supervise the execution of the scheme.

### CC-1's Accounts and Activities

g.      In or around November 2010, defendants ALMASI, KARTALY, PATAKI, HESZ, and other known co-conspirators recruited CC-1 to travel from Hungary to the United States to be a "money mule" in the scheme.

h.      Between on or about December 10, 2010, and on or about June 30, 2011, in furtherance of the scheme, CC-1 opened bank accounts at branches of Bank of America, Capital One, Chase Bank, Citizens Bank, Wachovia, and Wells Fargo, in the District of Columbia, Delaware, Maryland, Pennsylvania, and elsewhere, using the aliases: T.K., G.C., G.P., D.R., M.M., and R.C., and the business name Best Automotive Traders, LLC.

i.      On or about November 15, 2010, during his initial trip to the United States, CC-1 opened at least one bank account in the name of G.P.

j.      In or around December 2010, on one of several subsequent trips back to the United States, CC-1 met with CC-7 and defendant KARTALY, who provided an English-Hungarian translator for CC-1.  Co-conspirators also provided CC-1 with false identity sets to open dozens of bank accounts in the United States, several of which were located in the Washington, D.C., area.

k.      On or about December 13, 2010, defendants KARTALY, PATAKI, HESZ, and other co-conspirators, known and unknown to the grand jury, caused CC-1 to open a bank account (account number xxxx8502) at a branch of Bank of America in the District of Columbia in the name of R.C., using a counterfeit German passport and a counterfeit German driver's license in the name of R.C., with an address in the District of Columbia.

l.      On or about December 15, 2010, co-conspirators known and unknown to the grand jury caused a vehicle buyer in New York to wire $11,800 to Bank of America account number xxxx8502.

m.      On or about December 16, 2010, defendants KARTALY, PATAKI, HESZ, and other co-conspirators, known and unknown to the grand jury caused CC-1 to make a withdrawal in the amount of $9,500 from Bank of America account number xxxx8502 in the District of Columbia.

n.      Between on or about December 16, 2010, and on or about December 22, 2010, defendants KARTALY, PATAKI, HESZ, and other co-conspirators known and unknown to the grand jury caused CC-1 to withdraw $11,960 in cash proceeds of the vehicle fraud scheme from Bank of America account number xxxx8502 and transfer those funds to one of the known co-conspirators for delivery to other co-conspirators in Europe.

o.      On or about December 22, 2010, co-conspirators known and unknown to the grand jury caused a vehicle buyer in New York to wire $13,900 to Bank of America account number xxxx8502.

p.      Between on or about February 23, 2011, and on or about March 7, 2011, defendants KARTALY, PATAKI, HESZ, and co-conspirators known and unknown to the grand jury caused CC-1 to withdraw approximately $26,500 in cash proceeds of the vehicle fraud

10

scheme from TD Bank account number xxxx5432 at branch locations in the District of Columbia and Virginia and transfer those funds to one of the known co-conspirators for delivery in Europe.

q.      Between on or about February 16, 2011, and on or about March 11, 2011, defendants KARTALY, PATAKI, HESZ, and co-conspirators known and unknown to the grand jury caused CC-1 to withdraw approximately $42,535 in cash proceeds of the vehicle fraud scheme from Wachovia Bank account number xxxx2760 at branch locations in the District of Columbia and Virginia and transfer those funds to one of the known co-conspirators for delivery in Europe.

r.      Between on or about March 9, 2011, and on or about March 14, 2011, defendants KARTALY, PATAKI, HESZ, and co-conspirators known and unknown to the grand jury caused CC-1 to withdraw approximately $35,000 in cash proceeds of the vehicle fraud scheme from Capital One Bank account number xxxx6559 at branch locations in the District of Columbia, Virginia, and Maryland and transfer those funds to one of the known co-conspirators for delivery in Europe.

s.      On or about March 11, 2011, defendants KARTALY, PATAKI, HESZ, and co-conspirators known and unknown to the grand jury caused CC-1 to transfer by wire $39,000 of the vehicle fraud scheme's proceeds from Capital One Bank account number xxxx6559 to Bank of America account number xxxx6765, and then subsequently withdraw the funds and transfer them to one of the known co-conspirators for delivery in Europe.

## CC-23's Accounts and Activities

t.      On or before June 1, 2011, defendants PATAKI and HESZ, recruited CC-23 to travel from Hungary to the United States to be a "money mule" in the scheme.

11

u.      Between on or about June 1, 2011, and on or about August 31, 2011, CC-23 used at least the following aliases to open bank accounts in the District of Columbia and elsewhere:   P.A., M.D., P.H., B.G., P.I., G.P., L.S., and L.S.

v.      On or about July 22, 2011, CC-23 opened a bank account (account number xxxx7559) at a branch of TD Bank in the District of Columbia in the name of Vehicle International Brokers, LLC, using a counterfeit Portuguese passport and a counterfeit Portuguese driver's license in the name of M.D. with an address in the District of Columbia.

w.      Between on or about July 27, 2011, and on or about August 4, 2011, co-conspirators known and unknown to the grand jury caused vehicle buyers in Florida, Delaware, and New Jersey to wire $40,000, $18,000, and $20,000, to TD Bank account number xxx7559.

x.      Between on or about July 27, 2011, and on or about August 4, 2011, defendants PATAKI, HESZ, and other co-conspirators known and unknown the grand jury caused CC-23 to make twenty-nine cash withdrawals from TD Bank account number xxxx7559, in the District of Columbia, Maryland, and Northern Virginia, ranging from $20 to $11,000, totaling $78,420.

y.      On or before February 12, 2012, defendants PATAKI and HESZ sent CC-23 again to the United States for purposes of continuing the scheme.

**Defendant GAJDOS's Accounts and Activities**

z.      On or before August 2, 2011, defendants PATAKI and HESZ, recruited defendant GAJDOS to travel from Hungary to the United States to be a "money mule" in the scheme.

aa.    Between on or about August 2, 2011, and on or about August 25, 2011, defendant GAJDOS used the alias D.B. to open a UPS P.O. Box and a bank account in the District of Columbia.

bb.    On or about August 17, 2011, defendant GAJDOS opened a business account (account number xxxx4968) at Bank of America in the District of Columbia in the name of PPL Secure Services LLC ("PPL Secure"), using a counterfeit Portuguese passport and a counterfeit Portuguese driver's license in the name of D.B., with an address in the District of Columbia.

cc.    On or about August 18, 2011, co-conspirators known and unknown to the grand jury caused a vehicle buyer in Colorado to wire $25,000 to Bank of America account number xxxx4968.

dd.    On or about August 19, 2011, co-conspirators known and unknown to the grand jury caused a vehicle buyer in California to wire $26,500 to Bank of America account number xxxx4968.

ee.    On or about August 22, 2011, defendants PATAKI, HESZ, and other co-conspirators known and unknown to the grand jury caused defendant GAJDOS to make a cash withdrawal of $10,000 in cash proceeds of the vehicle fraud scheme from Bank of America account number xxxx4968 in the District of Columbia.

ff.    Between on or about August 22, 2011, and on or about August 24, 2011, defendants PATAKI, HESZ, and other co-conspirators known and unknown to the grand jury caused defendant GAJDOS to withdraw approximately $40,000 in cash proceeds of the vehicle fraud scheme from Bank of America account number xxxx4968 at branch locations in the District

of Columbia.   These funds were then transferred through CC-23 to CC-12 for delivery to other co-conspirators in Europe.

### Defendant KUTTENBERG's Accounts and Activities

gg.    On or before June 1, 2011, defendants PATAKI and HESZ, recruited defendant KUTTENBERG to travel from Hungary to the United States to be a "money mule" in the scheme.

hh.    From on or about June 20, 2011, through on or about August 31, 2011, defendant KUTTENBERG used at least the following aliases to open a UPS P.O. Box and bank accounts in the District of Columbia and elsewhere:  M.D., T.S., P.V., and P.K., and business names:  AMZ Finance Group, LLC, Trusted Services, LLC, and Vehicle Secure Traders, LLC.

ii.    On or about August 2, 2011, defendant KUTTENBERG opened a bank account (account number xxxx3749) at Bank of America in the District of Columbia in the name of Trusted Services LLC, using a counterfeit Portuguese passport and a counterfeit Portuguese driver's license in the name of P.V., with an address in the District of Columbia.

jj.    Between on or about August 10, 2011, and on or about August 15, 2011, co-conspirators, known and unknown to the grand jury caused vehicle buyers to wire $15,000, $9,100, and $18,000, to Bank of America account number xxxx3749.

kk.    Between on or about August 11, 2011, and on or about August 16, 2011, defendants PATAKI, HESZ, and other co-conspirators known and unknown to the grand jury caused defendant KUTTENBERG to make four cash withdrawals, ranging from $5,000 to $20,000, from Bank of America account number xxxx3749, at bank locations in the District of Columbia.   These withdrawals totaled $42,000 and were then transferred to CC-12 through CC-23 for delivery to other co-conspirators in Europe.

14

### C-8's and CC-9's Accounts and Activities

ll. In or around February 2013, CC-7 through CC-11 recruited defendant MOLNAR to find additional "money mules" to send to the United States. At CC-11's request, defendant MOLNAR recruited CC-8 and CC-9 to travel from Hungary to the United States to be "money mules" in the scheme. CC-7 financed the expenses for CC-8's and CC-9's travel, hotel, and start-up costs to conduct the fraudulent scheme in the District of Columbia and its surrounding metropolitan area.

mm. On or about February 14, 2013, defendant MOLNAR and CC-11 caused CC-8 and CC-9 to travel to the United States, including the District of Columbia, for purposes of executing the scheme.

nn. On or about March 5, 2013, defendant MOLNAR, CC-11, and other co-conspirators known and unknown to the grand jury caused a package to be sent via an interstate commercial carrier from Vienna, Austria, to CC-8 and CC-9, containing two fraudulent Hungarian passports with the pictures of CC-8 and CC-9, but with names different from their true names, which were intended to be used by CC-8 and CC-9 to open false bank accounts in the District of Columbia and elsewhere.

oo. On or about March 15, 2013, defendant MOLNAR, CC-10, and other co-conspirators known and unknown to the grand jury directed CC-8 to open three business bank accounts under the name of Automotives Market LLC at Wells Fargo Bank in Baileys Crossroads, Virginia, as well as at branches of PNC Bank and SunTrust Bank in Arlington, Virginia, using a fraudulent Hungarian passport in the name of I.T. and the address of a UPS store located at 2200 Wilson Boulevard, #13, Arlington, Virginia.

15

pp.     On or about March 28, 2013, defendant MOLNAR, CC-11, and other co-conspirators known and unknown to the grand jury caused a package to be sent via an interstate commercial carrier from Vienna, Austria, to CC-8 and CC-9 containing two fraudulent passports with the pictures of CC-8 and CC-9, but with names different from their true names, which were intended to be used by CC-8 and CC-9 to open false bank accounts in the District of Columbia and elsewhere.

qq.     On or about April 3, 2013, defendant MOLNAR, CC-10, and other co-conspirators known and unknown to the grand jury directed CC-9 to open four business bank accounts under the name of AMA Interstate Services LLC at BB&T Bank, Bank of America, Capital One Bank, and SunTrust Bank, which were opened at branches located in Washington, D.C., and Virginia, using a fraudulent Hungarian passport in the name of R.F. and the address of a UPS store located at 4094 Majestic Lane, #116, Fairfax, Virginia 22033.

rr.     Between on or about February 14, 2013, and on or about April 12, 2013, defendant MOLNAR and his two "money mules" were responsible for obtaining money from approximately nine victims of the vehicle fraud scheme, totaling approximately $243,320.

ss.     On or about April 4, 2013, CC-10 and co-conspirators known and unknown to the grand jury caused CC-9 to transfer via wire $20,000 of vehicle fraud proceeds from SunTrust bank account number xxxx3566, held in the name of AMA Interstate Services LLC, to a bank account held in the name of Jiangsu Best Baby Car Seat Mfg. Co. at Bank of Communications in Hong Kong.

**Boston Crew's Activities**

tt.    On or before September 30, 2011, CC-7 recruited defendant KOSZEGI to find additional individuals to go to the United States to open bank accounts in order to receive proceeds of the vehicle fraud scheme.

uu.    On or about September 30, 2011, defendant KOSZEGI obtained a passport in order to travel to the United States to supervise "money mules" sent to the United States to perpetrate the vehicle fraud scheme.

vv.    On or before October 14, 2011, defendant KOSZEGI recruited at least three individuals as "money mules" to travel to the United States from Hungary:  CC-20, CC-21, and CC-22.  On or about October 14, 2011, CC-20, CC-21, and CC-22, traveled to the United States for the purpose of perpetrating the scheme in Boston, Massachusetts, and Rhode Island.  The three money mules were recruited by, worked for, and reported to defendant KOSZEGI.

ww.    Between on or about October 19, 2011, and on or about November 30, 2011, defendant KOSZEGI traveled to the United States, including New York, Boston, and Rhode Island, in order to oversee the operations of the Boston crew of "money mules" and to provide money for their expenses, including hotel accommodations.

xx.    Between on or about October 14, 2011, and on or about November 30, 2011, Defendant KOSZEGI and his three "money mules" were responsible for obtaining money from approximately forty-four victims of the vehicle fraud scheme, totaling more than $1,000,000.

yy.    From in or around December 2010 to in or around August 2011, defendants ALMASI, KARTALY, PATAKI, HESZ, and co-conspirators known and unknown to the grand jury, caused "money mules" to deliver to CC-1, CC-7, CC-12, and CC-23, cash proceeds of the vehicle fraud scheme withdrawn from the fraudulently opened bank accounts in the District of

17

Columbia and elsewhere and then transport those funds to Europe via bulk cash smuggling and through a hawala in Brooklyn, New York.

**(Conspiracy to Commit Bank Fraud and Mail Fraud,
in violation of Title 18, United States Code, Section 1349)**

## COUNT TWO
**(Bank Fraud)**

28.     The allegations set forth in paragraphs 1 through 22, and 26 through 27, of this Superseding Indictment are realleged and incorporated by reference.

29.     On or about August 17, 2011, within the District of Columbia, and elsewhere, defendant GAJDOS, aided and abetted by others, knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution, to wit, Bank of America, which was a financial institution with accounts insured by the Federal Deposit Insurance Corporation, and to obtain money, funds, and assets owned by and under the custody and control of Bank of America by means of materially false and fraudulent pretenses, representations, and promises, to wit, presenting a counterfeit passport and a counterfeit driver's license not in the name of defendant GAJDOS, but in the name of D.B., to open an account at the financial institution, to wit, an account in the name of PPL Secure Services LLC (account number xxxx4968).

**(Bank Fraud, and Aiding and Abetting and Causing an Act to be Done, in violation of
Title 18, United States Code, Sections 1344(2) and 2)**

## COUNT THREE
**(Bank Fraud)**

30.     The allegations set forth in paragraphs 1 through 22, and 26 through 27, of this Superseding Indictment are realleged and incorporated by reference.

31.     On or about August 2, 2011, within the District of Columbia, and elsewhere, defendant KUTTENBERG, aided and abetted by others, knowingly executed and attempted to

18

execute a scheme and artifice to defraud a financial institution, to wit, Bank of America, which was a financial institution with accounts insured by the Federal Deposit Insurance Corporation, and to obtain money, funds, and assets owned by and under the custody and control of Bank of America by means of materially false and fraudulent pretenses, representations, and promises, to wit, presenting a counterfeit passport and a counterfeit driver's license not in the name of defendant KUTTENBERG, but in the name of P.V., to open an account at the financial institution, to wit, an account in the name of Trusted Services LLC (account number xxxx3749).

**(Bank Fraud, and Aiding and Abetting and Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1344(2) and 2)**

## COUNT FOUR
**(Conspiracy to Commit Travel Act Violation and False Use of a Passport)**

32.     The allegations and overt acts set forth in paragraphs 1 through 22 and 26 through 27 of this Superseding Indictment are realleged and incorporated by reference.

33.     From in or around November 2010 through in or around April 2013, within the District of Columbia and elsewhere, defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, KOSZEGI, GAJDOS, and KUTTENBERG, and other co-conspirators known and unknown to the grand jury did knowingly and intentionally conspire, combine, confederate, and agree to commit the following offenses against the United States, to wit:

a.     knowingly traveled in interstate and foreign commerce and used the mail and facilities in interstate and foreign commerce to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit, money laundering, in violation of Title 18, United States Code, Sections 1952 (interstate and foreign travel and transportation in aid of racketeering enterprises).

19

b.      willfully and knowingly used, and attempted to use, a false, forged, counterfeited, and altered passport and instrument purporting to be a passport, in violation of Title 18, United States Code, Section 1543 (false use of passport).

## The Goal of the Conspiracy

34.      The goal of the conspiracy was for the co-conspirators to enrich themselves through their execution of a scheme which included traveling in interstate commerce and using the mails to open fraudulent bank accounts to receive proceeds of the scheme and to launder the proceeds of the scheme from various States in the United States to co-conspirators in Europe, and using false and counterfeit passports in furtherance of the scheme.

## Manner and Means of the Conspiracy

35.      Among the additional manners and means by which the co-conspirators would and did carry out the objectives of the conspiracy were the following:

a.      They would and did direct "money mules" to obtain photographs of themselves that were used by the co-conspirators, known and unknown to the grand jury, to create fraudulent passports and driver's licenses.

b.      They would and did mail the false and fraudulent identity sets to "money mules" located in the United States via international and interstate carriers from Europe.

c.      They would and did direct the "money mules" to present the false and fraudulent identity sets and business documents to financial institutions in order to open up fraudulent bank accounts to receive the proceeds of the vehicle fraud scheme.

d.      They would and did maintain control over the "money mules" involved in the vehicle fraud scheme by directing their activities, including directing the "money mules" to

20

move interstate in order to conduct the vehicle fraud scheme in different locations in the United States, including the District of Columbia.

e.    They would and did direct the "money mules" to withdraw the fraudulently obtained funds in cash and deliver the funds to other co-conspirators or transfer the funds to foreign bank accounts for the eventual benefit of the co-conspirators.

**(Conspiracy to Commit Travel Act Violation and Use of a False Passport,
in violation of Title 18, United States Code, Section 371).**

## COUNT FIVE
**(Conspiracy to Commit Money Laundering)**

36.    The allegations and overt acts set forth in paragraphs 1 through 22 and 26 through 27 of this Superseding Indictment are realleged and incorporated by reference.

37.    From in or about November 2010 and continuing through in or about April 2013, in the District of Columbia and elsewhere, defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, KOSZEGI, GAJDOS, and KUTTENBERG, and other co-conspirators, known and unknown to the grand jury, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree with each other to violate Title 18, United States Code, Section 1956(a)(1)(B)(i), Title 18, United States Code, Section 1956(a)(2)(B)(i), and Title 18, United States Code, Section 1957:

a.    by conducting and attempting to conduct financial transactions, that is, the withdrawal and transfer of funds and monetary instruments, in and affecting interstate and foreign commerce, which transactions in fact involved the proceeds of specified unlawful activity, that is, bank fraud, in violation of Title 18, United States Code Section 1344(2), and mail fraud, in violation of Title 18, United States Code, Section 1341, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing

21

that the transactions were designed in whole and in part to conceal and to disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.    by knowingly engaging in and attempting to engage in monetary transactions, that is, the withdrawal and transfer of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through, and to financial institutions, in criminally derived property that was of a value greater than $10,000, and that was derived from specified unlawful activity, that is, bank fraud, in violation of Title 18, United States Code, Section 1344(2), mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1957(a).

## Manner and Means of the Conspiracy

38.    Among the additional manners and means by which defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, KOSZEGI, GAJDOS, and KUTTENBERG, and other co-conspirators known and unknown to the grand jury would and did carry out the objectives of the conspiracy were the following.

a.    They maintained control over the bank accounts fraudulently opened by the "money mules," including by directing the "money mules" when to withdraw the fraudulently obtained funds in cash and when to transfer by wire funds to another account.

b.    They arranged to meet the "money mules" in public places within the District of Columbia and elsewhere to exchange bags containing over $10,000 of cash proceeds from the vehicle fraud scheme withdrawn from the fraudulently opened bank accounts with similar looking empty bags.

22

c.      They traveled with cash proceeds of the vehicle fraud scheme in amounts over $10,000 and delivered them to individuals in New York associated with a "hawala" and other co-conspirators in Europe.

d.      They received cash proceeds of the vehicle fraud scheme in Europe by picking up proceeds of the scheme from a corresponding hawala in Europe and by hand-delivery of cash.

e.      They divided up the proceeds of the vehicle fraud scheme amongst the co-conspirators, including defendants ALMASI, KARTALY, MOLNAR, PATAKI, HESZ, KOSZEGI, GAJDOS, and KUTTENBERG.

**(Conspiracy to Commit Money Laundering, in violation of
Title 18, United States Code, Section 1956(h)).**

## CRIMINAL FORFEITURE ALLEGATION

1.      Upon conviction of any of the offenses alleged in Counts One through Three, the defendants shall forfeit to the United States any property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as a result of these offenses, pursuant to 18 U.S.C. § 982(a)(2)(A).    The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of these offenses, pursuant to 18 U.S.C. § 982(a)(2)(A).

2.      Upon conviction of either of the offenses alleged in Count One or Count Four, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).    The United States will also seek a forfeiture money judgment against the

23

defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

3.    Upon conviction of the offense alleged in Count Five, the defendants shall forfeit to the United States any property, real or personal, involved in this offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).   The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, involved in this offense, or any property traceable to such property.

4.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(2)(A), Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(1), and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON.

ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

25